[Cite as *State v. Day*, 2025-Ohio-5625.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 114582 |
| DUJUAN DAY, SR., | : | |
| Defendant-Appellant. | : | |

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 18, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690610-A

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey S. Schnatter and Morgan Austin, Assistant Prosecuting Attorneys, *for appellee.*

Jonathan N. Garver, *for appellant.*

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant Dujuan Day, Sr. ("Day") appeals his convictions for murder and other charges. For the reasons that follow, we affirm the convictions.

**Factual and Procedural History**

{¶ 2} A grand jury convened and issued an indictment against Day for the following charges surrounding the death of Benjamin Rotger ("Rotger") on March 18, 2024: aggravated murder in violation of R.C. 2903.01(A), with one- and three-year firearm specifications (Count 1); murder in violation of R.C. 2903.02(A), with one- and three-year firearm specifications (Count 2); murder in violation of R.C. 2903.02(B), with one- and three-year firearm specifications (Count 3); felonious assault in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications (Count 4); felonious assault in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications (Count 5); having weapons while under disability in violation of R.C. 2923.13(A)(2), with a forfeiture specification (Count 6); and having weapons while under disability in violation of R.C. 2923.13(A)(3), with a forfeiture specification (Count 7).

{¶ 3} Prior to trial, Day filed notice that he intended to raise claims of self-defense and defense of others. He alleged generally that he fired warning shots at an unknown person who pulled into his driveway and approached the side door at a fast pace. Day claimed he acted to defend himself and his family who were inside the home. Additionally, Day elected to waive his right to a jury trial on the weapons while under disability charges and try them to the bench.

{¶ 4} At trial the following testimony was offered. Ebone Booth ("Booth") testified that she was Rotger's girlfriend of five years though they had been friends for much longer. She also knew Day and identified him as Rotger's friend and as the

godfather of three of their children. The last time she saw Day, which was a week before Rotger was killed, Booth believed the two were on good terms. She observed them laughing and talking, and Day congratulated her on her pregnancy.

{¶ 5} On March 18, 2024, Booth, Rotger, the children, and another family member were home entertaining themselves when Rotger received a phone call around 8:45 or 8:50 p.m. Booth testified that the caller was Day. During the call, Booth observed that Rotger became excited because Day was going to repay money he owed Rotger. Booth then watched Rotger put on a zip-up hoodie, a pullover jacket, and another zip-up hoodie because it was snowing outside. She did not see him put on a ski mask prior to leaving the house. Rotger left on a scooter he had been driving for several months. Booth believed that Day was aware that Rotger drove the scooter.

{¶ 6} Anita Griggs ("Griggs"), Day's fiancée, testified that she, Day, and three children lived together in a house on Rexwood Avenue in Garfield Heights. She also knew that Day and Rotger were good friends; however, Rotger was not welcome in her home because of an incident that occurred five years prior. Per Griggs, Day did not know what occurred but was aware that she did not want Rotger in the home. On March 18, 2024, the family was celebrating Griggs's 16-year-old son's birthday at home. On the same date, Day enlisted the help of a friend to install surveillance cameras around the home. Griggs went to bed early, around 7:00 p.m., and was awoken by the sound of gunshots. She called 9-1-1 but the call did not go through. She called two more times, once informing the police that there were shots

fired and that there was a body outside her home and a second time to inquire whether police were en route. On redirect examination, Griggs testified that an assault rifle ("AR") pistol used in the shooting belonged to her. She kept it under the mattress on her side of the bed in the bedroom she shared with Day in the attic of the house.

{¶ 7} A recording of one of the 9-1-1 calls established that Day took the phone from Griggs at one point, identified himself as the shooter, and stayed on the phone with the dispatcher until police arrived a short time later. Video from Day's surveillance cameras showed that when police arrived, Day was standing on the front porch. He immediately identified himself as the shooter and advised the officers that the person he shot was in the driveway.

{¶ 8} When he arrived on scene, Garfield Heights Police Officer James Huskey ("Officer Huskey") left Day with his partner and proceeded up the driveway to investigate. He found the shooting victim was unresponsive, lying on the ground near a Vespa-style moped. Officer Huskey checked the victim's pulse and found the body cold to the touch with no pulse.

{¶ 9} In anticipation of securing a search warrant, officers moved Day and the other household members outside of the premises. As part of the initial sweep, Officer Brian Regovich ("Officer Regovich") observed what he described as a rifle at the top of the steps to the attic. Pursuant to protocol, Officer Regovich merely observed the location of the weapon, continued to ensure the house was secure, and left to await the arrival of the search warrant.

{¶ 10} During the ensuing investigation, police officers secured the suspected homicide weapon, magazines, multiple shell casings, and the newly installed surveillance system. Ohio Bureau of Criminal Investigation ("BCI") Investigator Laura McClintock ("Investigator McClintock") testified that the shell casings could be separated into three groups: (1) rifle casings that appeared to be fresh, i.e., recently fired, which were located in the driveway, (2) three older .45-caliber casings, and (3) a cluster of older rifle cartridge casings that were discovered behind the house against the wall. Additionally, Investigator McClintock identified ten suspected ballistic impacts caused by projectiles hitting the driveway and/or a nearby fence, some of which appeared to be fresh. She could not tell when the impacts occurred but they did not appear weathered. Investigator McClintock also took measurements of the scene and determined that Rotger's body was a little over 6.5 meters (approximately 21.3 feet) from the side door of Day's house.

{¶ 11} Garfield Heights IT Manager Justin Cawthon ("Cawthon") testified regarding his inspection of the surveillance system Day installed. He testified that it was a motion-activated system and that it had been set to activate when there was a sustained period of movement of at least five seconds. The system would record the movement as long as it lasted including the initial five seconds. Cawthon was able to secure multiple videos from the system. The State introduced four videos, two of which captured Rotger's arrival at Day's home, which showed the taillights of his scooter disappearing behind the front porch, and Day firing the pistol from the side door towards the back of the house almost one minute later.

{¶ 12} Cuyahoga County Medical Examiner and Crime Laboratory Director Dr. Thomas Gilson ("Dr. Gilson") testified regarding Rotger's autopsy and toxicology report. Dr. Gilson testified that the toxicology report showed cocaine usage but indicated that Rotger was not under the influence of cocaine at the time of the shooting. Further, Dr. Gilson testified that Rotger suffered 11 gunshot injuries. One bullet went through his lower left cheek, broke his jawbone, and exited the left side of his neck. There was evidence that that bullet went through a ski mask Rotger was wearing at the time he was shot. The trajectory of most of the wounds were from left to right, which would be consistent with the gun being on Rotger's left. Two of the wounds were fatal, and both entered Rotger's back suggesting his back was facing the weapon. Dr. Gilson further testified that given the trajectory of one of the fatal wounds he would expect the victim to have lost consciousness within seconds of being shot. He could not say precisely how many seconds but testified that it would be unlikely for a person to be conscious for more than several seconds.

{¶ 13} Dr. Gilson identified another gunshot wound, which entered Rotger's side near the juncture of his hip and exited through his breast plate. When asked whether the bullet's trajectory was consistent with someone shooting from approximately 21 feet away at someone who was lying prone on the ground, Dr. Gilson testified:

> And it's going to be — [the shooter's] going to be to the left of Mr. Rotger because it's going from left to right. And it's going to be pretty — either far down or he's going to be well above him, you know, standing like at an elevated thing like almost on top of a vehicle or something. It's not

something he's necessarily going to get standing face-to-face with somebody so the laying down does make some sense.

{¶ 14} Of the 11 entrance wounds Dr. Gilson identified, five entered Rotger from the back or the side. Moreover, two of those gunshot wounds were fatal after entering Rotger while his back was to the gun.

{¶ 15} Cuyahoga County Regional Forensic Science Laboratory Trace Analyst Lisa Przepyszny ("Przepyszny") examined Rotger's clothing to determine the muzzle-to-target distance, i.e., the distance between the end of the firearm and Rotger based on evidence from his clothing. She determined that none of the defects she identified came from either contact or close-range shots. She defined "contact" as a defect created when the gun is in contact with an item of clothing. Alternatively, "close range" describes a distance anywhere from contact out to about one foot. Przepyszny determined that the evidence on the ski mask suggested a "distance" shot, which would be several feet away to a hundred yards. She also testified that her estimates were based on a handgun and that the distances for rifles could be further, but there was little data available. BCI Firearms Examiner Andrew Chappell testified that the AR pistol used in this case was designed to fire rifle cartridges.

{¶ 16} Garfield Heights Police Detective Patrick Monnolly testified that he secured a search warrant for Day's cell-phone records. The records showed multiple calls from Day to Rotger at each of Rotger's two cell-phone numbers, including a call at 8:55 p.m., on the night of the homicide that lasted approximately two and one-half minutes.

{¶ 17} Day elected to testify on his own behalf and he testified as follows. Day and Rotger had been friends since 2015. Day and his family moved into the Rexwood home approximately a year to a year and a half prior to the incident, but Rotger had never visited the home prior to March 18, 2024. Day denied having plans to see Rotger on that date but acknowledged that they spoke on the phone early in the day. He informed Rotger that the family was staying home to celebrate the birthday of Griggs's son. Day denied calling Rotger later in the evening. He remembered sending Rotger a funny picture via text message but denied speaking to him that night.

{¶ 18} After Griggs went to bed, Day talked to the friend who helped him install the surveillance equipment. Day eventually went upstairs to the attic bedroom leaving his friend to sleep on the couch. Once upstairs, Day heard a loud motor and looked out the window to see what it was. He saw someone in a "hoodie mask" driving a scooter. He watched that person drive past his house, stop, then back up. He then observed the scooter turn and drive up his driveway. Day did not recognize the person on the scooter.

{¶ 19} Day grabbed the AR pistol from under the bed and headed downstairs. When he was on the landing he looked out the window and saw tire tracks going to the back yard but could not see the scooter. When he got downstairs, Day unlocked and opened the side door, and peered outside through the screen door. The home had an unattached garage that was several feet from the back edge of the house. Day had parked his truck close to the garage door, which left the side

door unobstructed. He testified he did not see anyone initially, but called out asking who was there. He called out more than once but received no answer. At that point, Day opened the screen door and immediately saw someone with a mask come from around the side of his parked truck. Day testified that he started shooting because he was scared.

{¶ 20} During further questioning, Day noted that when he first saw Rotger, he appeared crouched or creeping up on the side of his truck. He fired and continued to fire because Rotger was approaching him fast. Day averred that he heard someone jumping a fence into his neighbor's backyard. The lights were off in both his and his neighbor's yard, and Day could not see whether other people were in the backyard.

{¶ 21} After the shooting, Day went back into the house, checked on his youngest child, and called up the stairs to Griggs to tell her to call 9-1-1 because he shot someone. The defense introduced the 9-1-1 call that was partially introduced by the State earlier. The defense exhibit included a conversation between Day and the dispatcher notifying her that he was the person who fired shots, the firearm was in the house, someone was injured, and he did not know who the person was. Nevertheless, Day testified that he realized the decedent was Rotger when he heard him speak after the shooting and recognized his voice.

{¶ 22} During cross-examination, Day acknowledged that he was not permitted to possess a firearm because of prior convictions. After discussing his prior convictions, Day expounded on the circumstances surrounding the shooting.

He testified that he saw someone coming from the area of the garage. While typically the garage lights were off and the doors closed, that night the garage doors were open and the light was on. Day was unsure whether he left the door open and the light on because he had been in the garage earlier to get the ladder to put up the surveillance equipment. Day saw the person crouched down by the side of his truck and then saw him approach fast when Day opened the screen door. Day testified that the person kept approaching and he kept shooting, although he did not remember how many times he pulled the trigger.

{¶ 23} After the close of testimony, the defense requested jury instructions on self-defense and the defense of others. The trial court denied the request finding that neither defense fit the facts but that the appropriate jury instruction would be defense of a residence. The defense also requested an instruction on the lesser included offense of reckless homicide, which the trial court denied.

{¶ 24} Later, the parties collaborated and presented the trial court with agreed jury instructions. The agreed instructions included an instruction on self-defense but not on defense of others or defense of a residence. The trial court used the parties' agreed instructions to instruct the jury.

{¶ 25} The jury ultimately found Day guilty of Counts 2 through 5, purposeful murder, felony murder, and two counts of felonious assault, including the associated gun specifications. They found him not guilty of Count 1, aggravated murder. The trial court found Day guilty of the having weapons while under disability charges in Counts 6 and 7.

{¶ 26} For the purposes of sentencing, the trial court found that Counts 3, 4, and 5 merged into Count 2 and that Counts 6 and 7 merged. The State elected to proceed on Counts 2 and 6. The trial court imposed a three-year sentence on the gun specification in Count 2 to run prior to and consecutively to a life sentence without the possibility of parole for 15 years. The trial court also imposed a three-year sentence on the firearm specification associated with Count 3 to run consecutively to the firearm specification in Count 2 and consecutively to the prison term in Count 2. With respect to the charge for having weapons while under disability, the trial court imposed a sentence of 12 months to run concurrently to the other sentences, for an aggregate term of life with the possibility of parole after 21 years.

{¶ 27} Day appeals assigning the following errors for our review:

**Assignment of Error No. 1**

The evidence is insufficient, as a matter of law, to support [Day's] convictions for having a weapon while under disability.

**Assignment of Error No. 2**

[Day's] convictions are against the manifest weight of the evidence.

**Assignment of Error No. 3**

The trial court committed prejudicial error and denied [Day] due process of law by refusing to instruct the jury on the defense of another.

**Assignment of Error No. 4**

The trial court committed prejudicial error and denied [Day] due process of law by failing to give proper jury instructions on the defense of self-defense.

## Assignment of Error No. 5

The trial court committed plain error and denied [Day] due process of law by failing to give a limiting instruction on the use of evidence of prior convictions.

## Assignment of Error No. 6

The trial court committed prejudicial error by refusing to instruct the jury on the lesser included offense of reckless homicide.

## Assignment of Error No. 7

The trial court committed prejudicial error and denied [Day] due process of law by refusing to admit [the defense's] Exhibit P, the audio/video recording of the police interrogation Day made a few hours after the shooting.

## Assignment of Error No. 8

Day received ineffective assistance of counsel resulting in a denial of due process of law and the right to counsel.

## Law and Analysis

{¶ 28} For ease of analysis, we will address the assignments of error out of order.

## Weight of the Evidence

{¶ 29} In the second assignment of error, Day challenges his convictions based on the weight of the evidence. Day argues that the more credible and undisputed evidence presented at trial supported his claim of self-defense, and therefore the jury and the trial court lost their way and created a manifest miscarriage of justice when finding him guilty of the charges.

{¶ 30} The "'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion. . . ." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.

> "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 31} Notably, the having-weapons-while-under-disability charges were tried to the bench and

> "'[i]n reviewing a bench trial, "an appellate court presumes that a trial court considered nothing but relevant and competent evidence in reaching its verdict," and this presumption "may be overcome only by an affirmative showing to the contrary by the appellant.'"

*State v. Jeffries,* 2018-Ohio-5039, ¶ 15 (8th Dist.), quoting *State v. Pearson,* 2015-Ohio-3974*,* ¶ 13 (10th Dist.), quoting *State v. Wiles,* 59 Ohio St.3d 71, 86 (1991).

{¶ 32} Because Day raises slightly different issues with respect to the charges for having weapons while under disability, we begin our examination of Day's manifest-weight-of-the-evidence challenge to the crimes of murder and felonious assault.  Day argues that his self-defense claim should have prevailed.  A claim of self-defense "'is an admission of all essential elements of the charged crime, but with the legal recognition that the accused's actions were justified under the

circumstances.'" *State v. Webb*, 2025-Ohio-456, ¶ 26 (8th Dist.), quoting *State v. Loyed*, 2004-Ohio-3961, ¶ 32 (8th Dist.). When a defendant claims self-defense, the defendant "'concedes he had the purpose to commit the act, but asserts that he was justified in his actions.'" *State v. Davis*, 2021-Ohio-2311, ¶ 38 (8th Dist.), quoting S*tate v. Talley*, 2006-Ohio-5322, ¶ 45 (8th Dist.).

{¶ 33} R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 34} Accordingly, "when a defendant presents a claim of self-defense in a criminal case, the State has the burden of disproving that self-defense claim beyond a reasonable doubt." *State v. Messenger*, 2022-Ohio-4562, ¶ 1. When self-defense is at issue, the weight of the evidence addresses whether the State met its burden of persuasion to establish that the defendant did not act in self-defense. *Id.* at ¶ 27. The State must, therefore, prove at least one of the following elements beyond a reasonable doubt:

> (1) that [the defendant] was at fault in creating the situation giving rise to the affray; or,
>
> (2) that [the defendant] did not have reasonable grounds to believe or an honest belief that he was in imminent danger of death or great bodily harm; or,
>
> (3) [the defendant] violated a duty to retreat or avoid danger.

*State v. Jones,* 2025-Ohio-168, ¶ 16 (8th Dist*.), citing State v. Scales*, 2024-Ohio-2171, ¶ 25 (8th Dist.)*; State v. Walker*, 2021-Ohio-2037*,* ¶ 13 (8th Dist.).

{¶ 35} In 2021, the General Assembly introduced R.C. 2901.09(B), which states: "a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be."

{¶ 36} A claim of self-defense generally involves issues of witness credibility. *State v. Shartle*, 2025-Ohio-564, ¶ 19 (2d Dist.), citing *State v. Campbell*, 2024-Ohio-1693, ¶ 32 (8th Dist.). "''Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact.''" *Campbell* at ¶ 32, quoting S*tate v. Lawrence*, 2023-Ohio-3419, ¶ 41 (11th Dist.), quoting *State v. Bentley*, 2023-Ohio-1792, ¶ 24 (11th Dist.). "[A] conviction is not against the manifest weight of the evidence because the trier of fact believed the State's version of events over the defendant's version." *Walker* at ¶ 18, quoting *State v. Lipkins*, 2017-Ohio-4085, ¶ 39 (10th Dist.), citing *State v. Gale*, 2006-Ohio-1523, ¶ 19 (10th Dist.).

{¶ 37} Day focuses on his acquittal of aggravated murder arguing that the jury's decision signaled they found the self-defense testimony more credible than the State's theory of the case. However, two things can be true. The jury could have found that the State did not prove Day was guilty of aggravated murder, which requires premeditation, but did prove that Day did not act in self-defense.

{¶ 38} Here, the evidence established that Rotger was over 21 feet from Day when he was shot, that Rotger was unarmed, that Day shot him 11 times less than a

minute after Rotger pulled into the driveway, and that, at most if Day is believed, Rotger was approaching him quickly when Day fired the shots, but not quickly enough to get beyond the rear of the truck near the neighbor's fence. Additionally, the video of the incident showed Day fire several shots from the doorway, step outside, and then fire several more shots with the weapon tilted downward as if firing on someone lying on the ground. The forensic evidence established that five of the shots, including the two fatal shots, occurred when Rotger was facing away from the firearm.

{¶ 39} The jury was not required to believe Day's testimony that Rotger was behaving in a threatening manner. Nor, given the short time frame and the forensic evidence, were they required to believe that Day observed the situation from the attic, looking out the window at least twice; grabbed the firearm; went down stairs; stopped to look through the window on the landing; went to the side door; called out to Rotger two or three times; then opened the screen door; and began shooting after Rotger approached him. Based on the facts produced at trial, the jury could have determined that Day did not have reasonable grounds to believe or a bona fide belief that he was in imminent danger of death or great bodily harm or that Day used unreasonable force to repel an attack.

{¶ 40} Based on the foregoing, we do not find that the jury lost its way or created a manifest miscarriage of justice by its verdict. The jury's finding that Day did not act in self-defense was supported by the weight of the evidence.

{¶ 41} We now turn to whether the weapons-while-under-disability charges were supported by the manifest weight of the evidence. In order to establish a violation of both R.C. 2923.13(A)(2) and (3) as charged under Counts 6 and 7 in this case, the State was required to establish that Day did "knowingly acquire, have, carry, or use any firearm or dangerous ordnance" while either convicted of an offense of violence and/or a drug offense. In the instant case, Day claimed self-defense; accordingly, he acknowledged that he knowingly acquired, had, carried, or used the firearm while under disability for several prior convictions. *Loyed*, 2004-Ohio-3961, at ¶ 32 (8th Dist.) (finding that a claim of self-defense "is an admission of all essential elements of the crime charged, but with the legal recognition that the accused's actions were justified under the circumstances").

{¶ 42} Day argues that (1) he used the weapon in self-defense and (2) beyond his use for that purpose there was no evidence that he exercised dominion and control over the firearm prior to the homicide. After a thorough review of the record, we disagree.

{¶ 43} A claim of self-defense can apply to a defendant charged with having weapons while under a disability. *State v. Christian*, 2021-Ohio-3737, ¶ 15 (8th Dist.). Notably, a defendant has the right to act in self-defense with a firearm if "'he did not knowingly acquire, have, carry or use a firearm previously.'" *Id.*, quoting *State v. Hardy*, 60 Ohio App.2d 325, 330 (8th Dist. 1978). That is, "the self-defense exception " 'does not apply in circumstances where the defendant had possession of the weapon prior to the incident giving rise to the charges or in anticipation of a

confrontation.""" *Id.* at ¶ 17, quoting *State v. Kyle*, 2020-Ohio-3281, ¶ 34 (8th Dist.), quoting *State v. Armstrong*, 2016-Ohio-2842, ¶ 25 (8th Dist.). Furthermore, the claim only applies to the defense of self, not the defense of others. *Id.* at ¶ 15.

{¶ 44} This was not a case where a defendant picked up a weapon in the face of immediate danger. Day picked up the firearm from the attic based solely on evidence that someone had driven up his driveway. At that time, he did not have any evidence that the person was a threat or that a weapon was necessary. Day cites *Hardy* in support of his argument that he did not possess the firearm prior to his act of self-defense. However, in *Hardy* the defendant was working in a bar where there was a firearm that was accessible by all the employees. When directly threatened with a knife, the defendant grabbed the firearm to defend himself. Day was not faced with an immediate threat when he picked up the AR pistol.

{¶ 45} Instead, we find that this case is akin to *Christian*, where the defendant picked up the firearm in anticipation of danger and then got into a car to travel to a destination where he might need to defend himself. Similarly, Day picked up the firearm in anticipation of a confrontation and not in response to an actual threat. Therefore, Day possessed the firearm before he knew a threat existed, and the self-defense exception does not apply.

{¶ 46} Based on the foregoing, we find that the greater weight of the evidence established that Day's actions did not fall into the self-defense exception for a weapons-while-under-disability charge.

{¶ 47} Accordingly, the second assignment of error is overruled.

## Sufficiency of the Evidence for the Charge of Having Weapons While Under Disability

{¶ 48} In the first assignment of error, Day argues there was insufficient evidence to support his having-weapons-while-under-disability convictions. We disagree.

{¶ 49} "A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State met its burden of production at trial." *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *Thompkins,* 78 Ohio St.3d at 390. Sufficiency of the evidence requires a review of the evidence admitted at trial and a determination of "'whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Goins*, 2021-Ohio-1299, ¶ 13 (8th Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court must determine, "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* We do not ask "'whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.'" *Id.*, quoting *Thompkins* at 390.

{¶ 50} As in his weight-of-the-evidence challenge, Day argues that there was insufficient evidence that he possessed the weapon for any reason other than to use it in self-defense. However, even if believed, Day's testimony established that he picked up the firearm while in the attic well away from the supposed danger outside

of the house. Based on the foregoing, there was sufficient evidence to support the finding of guilt for the having-weapons-while-under-disability charges.

{¶ 51} Accordingly, the first assignment of error is overruled.

**The Defense-of-Others Jury Instructions**

{¶ 52} In the third assignment of error, Day challenges the trial court's refusal to give a defense-of-others instruction. The trial court denied Day's request for an instruction on defense of others finding that Day was not entitled to those instructions based on the court's view of the evidence. We agree with the trial court's ruling.

{¶ 53} We review a trial court's refusal to give jury instructions for an abuse of discretion. We must determine "whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Sims*, 2005-Ohio-5846, ¶ 12 (8th Dist.), citing *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). A court abuses its discretion when its decision is "unreasonable, arbitrary or unconscionable." *State v. Hickman*, 2024-Ohio-5747, ¶ 32, quoting *State v. Beasley*, 2018-Ohio-16, ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An appellate court reviews the jury instructions in their entirety to determine the existence of prejudicial error. *Sims* at ¶ 12, citing *State v Porter*, 14 Ohio St.2d 10, 13 (1968).

{¶ 54} In the instant case, Day requested self-defense and defense-of-other instructions. The trial court found that Day failed to meet the burden of production on both claims. The parties later submitted agreed jury instructions that included

instructions on self-defense. Nonetheless, the trial court's refusal to give the defense of others instruction remained.

{¶ 55} Ordinarily, when requested, jury instructions should be given if they are correct statements of law when applied to the facts of the case. *State v. Abalos*, 2011-Ohio-3489, ¶ 13 (6th Dist.), citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). While the State must disprove a claim of defense of others by proof beyond a reasonable doubt, a defendant must present legally sufficient evidence regarding every element of the defense of others claim to warrant a jury instruction on the claim. R.C. 2105.01(B)(1); *State v. Palmer*, 2024-Ohio-539, ¶ 1, 19 (addressing self-defense claims specifically by discussing changes in R.C. 2901.05 effecting self-defense, defense-of-others, and defense-of-residence claims). A defendant must present legally sufficient evidence regarding every element of the defense-of-others claim. *Palmer* at ¶ 1, 19. "This burden of production is de minimis and can be satisfied with the State's own evidence." *Id.* at ¶ 1, 20.

{¶ 56} Defense of others follows the elements of self-defense except that the person at risk of harm is someone other than the defendant. A person may use deadly force in the defense of another if (1) the person defended was not at fault in creating the situation giving rise to the affray; (2) the defendant had reasonable grounds to believe that the person defended was in imminent or immediate danger of death or great bodily harm; (3) the defendant had an honest belief, even if mistaken, that the person defended was in imminent or immediate danger of bodily harm; and (4) the defendant used reasonable force. *State v. Williford*, 49 Ohio St.3d

247, 250 (1990); *State v. Wenger*, 58 Ohio St.2d 336, 339-340 (1979); *State v. Marsh*, 71 Ohio App.3d 64, 68 (11th Dist. 1990); *see Ohio Jury Instructions,* CR § 421.211 (Rev. Jan. 25, 2025). *See State v. Cumberlander,* 2024-Ohio-2431, ¶ 41, fn.9 (10th Dist.) (finding that the elements of defense of another are the same as self-defense), citing *State v. Moss,* 2006-Ohio-1647, ¶ 14, 15 (10th Dist.) (finding that where the defendant claimed to be defending another he had to establish that "he was lawfully defending [that person]; that he was acting in good faith and upon reasonable grounds that [the person] was in imminent danger of death or great bodily harm; that he used a reasonable degree of force to defend [that person]; and that he used no more force than he would have been entitled to use had he been the person attacked").

{¶ 57} Applying the rationale espoused in *Messenger* and *Palmer* to defense of others, one court noted:

> "'[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a [defense-of-others] claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.'"

*State v. Murray,* 2025-Ohio-1485, ¶ 24 (2d Dist.), quoting *Palmer* at ¶ 20, quoting *Messenger*, 2022-Ohio-4562, at ¶ 25.

{¶ 58} Finally, the elements of defense of others are cumulative; therefore, if the evidence failed to establish any one element of the defense, Day was not entitled to the instruction. *Walker*, 2021-Ohio-2037, at ¶ 28 (8th Dist.).

{¶ 59} With respect to the first element, no evidence was presented to indicate there was any interaction between Day's family and Rotger. Accordingly, the evidence does not support a finding that the family was at fault in creating the situation that lead to the shooting.

{¶ 60} The second and third elements reflect "'a combined subjective and objective test'" to address whether Day both subjectively and objectively believed his family was in imminent or immediate danger of death or great bodily harm. *Cumberlander*, 2024-Ohio-2431, at ¶ 45 (10th Dist.), quoting *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). The objective test requires consideration of

> "whether, considering all of the defendant's particular characteristics, knowledge, or lack of knowledge, circumstances, history, and conditions at the time of the attack, he reasonably believed [the protected person(s) were] in imminent danger."

(Emphasis in original.) *Id.,* quoting *id.*

{¶ 61} If the trial court finds that the objective test is met, the court "'must determine if, subjectively, this particular defendant had an honest belief that [the protected persons were] in imminent danger.'" *Id.,* quoting *id.* at 331.

{¶ 62} Day testified that he heard the scooter when he was in the attic and that the motor was loud. He looked out of the window and saw the scooter a house or two down from his. Then he saw the driver back up and drive into his driveway. Day testified that, from the surveillance video, he saw the individual approach the garage, which was open and the interior light was on. He could see that the person was wearing a ski mask. On appeal, Day argues that

the presence of an uninvited, masked intruder on his property late at night on a dark, snowy night caused him to fear, not only for his own safety, but for the safety of his fiancé and his children who were asleep in the house.

{¶ 63} The fact that someone on a scooter was driving at night in a snowstorm and was bundled up and wearing a ski mask is not objectively threatening. However, looking at the evidence in a light most favorable to Day, some level of concern is reasonable when the person is unidentifiable and unexpected. However, Day points to no evidence that objectively point to a reasonable belief that Day or his family members were in imminent or immediate danger of death or great bodily harm justifying the use of deadly force. For instance, Day did not allege that Rotger had a weapon; in fact, he testified he could not see Rotger's hands. Additionally, even if we accept Day's testimony that Rotger was moving towards him, the evidence establishes that Rotger's body was found approximately 21 feet from Day's door. This contradicts Day's testimony that Rotger was an immediate or imminent threat. Day failed to establish that he had either an objective or subjective belief that Rotger was an immediate or imminent threat, thus failing to meet his burden of production. We need not consider the remaining elements, because the failure to establish one element is sufficient.

{¶ 64} Accordingly, the trial court did not abuse its discretion when it refused to give instructions on the defense of others. The third assignment of error is overruled.

**The Self-Defense Jury Instruction**

{¶ 65} In the fourth assignment of error, Day challenges what he claims were "improper" jury instructions on self-defense. Day raises several issues with respect to the self-defense instructions that the trial court gave to the jury. He argues that the trial court (1) erred when it refused to give a jury instruction on self-defense; (2) was required to instruct the jury that a person is presumed to have acted in self-defense when defending themselves from someone in the process of entering their home; (3) committed prejudicial error by giving confusing and misleading jury instructions on defense of a residence; (4) committed plain error when it gave an instruction on unreasonable force; (5) erred because the instructions in total were presented in a biased, confusing, and misleading way; and (6) committed cumulative errors that were prejudicial and caused a denial of due process of law.

{¶ 66} As noted previously, while the trial court did originally refuse to instruct the jury on self-defense, the parties submitted written jury instructions, which included the instruction, in turn, the trial court subsequently read those agreed instructions to the jury. When asked, the defense attorney acknowledged that the jury instructions were a product of a 90-minute discussion with the State. It appears from the record that those same jury instructions were provided to the jury during deliberations. Both parties therefore had an opportunity to review the jury instructions and correct any errors before the trial court submitted them to the jury.

{¶ 67} Notably, "an agreed upon jury instruction that forms the basis for error on appeal is invited error." *McQueen v. Greulich*, 2014-Ohio-3714, ¶ 21 (8th Dist.), citing *Ratliff v. Mikol*, 2011-Ohio-2147, ¶ 15 (8th Dist.), citing *Patton v. Cleveland*, 95 Ohio App.3d 21, 26 (8th Dist. 1994). "[A] party may not take advantage of an error that the party invited or induced." *Id.*, citing *id.*

{¶ 68} Because he agreed to the instructions submitted to the jury, Day cannot now seek to argue that the jury instructions were erroneous when he invited the trial court to make the alleged errors. Based on the foregoing, the fourth assignment of error is overruled.

{¶ 69} Although we find that Day invited error by agreeing to the jury instructions, we must still consider whether Day received ineffective assistance of counsel when his lawyer did not challenge the jury instructions. Thus, we turn to the eighth assignment of error.

**Ineffective Assistance of Counsel**

{¶ 70} In the eighth assignment of error, Day argues that he received ineffective assistance of counsel because his trial lawyer failed to (1) challenge the trial court's failure to give a limiting instruction on his prior convictions, (2) object to the trial court's decision not to instruct the jury that Day was presumed to act in self-defense when in his residence, and (3) object to the instruction on unreasonable force when "there was no factual question as to whether the force used was deadly or non-deadly."

{¶ 71} In order to establish a claim of ineffective assistance of counsel, Day must demonstrate both (1) that his counsel's performance fell below an objective standard of reasonable representation, and (2) that he was prejudiced by the performance, i.e., that but for counsel's errors there was a reasonable probability that the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984), *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraphs two and three of the syllabus.

{¶ 72} "[E]vidence of prior convictions is prohibited except under narrow circumstances." *State v. Trimble*, 2009-Ohio-2961, ¶ 172. "One such circumstance is for impeachment purposes when a defendant testifies." *State v. Jackson*, 2010-Ohio-2297, ¶ 25 (3d Dist.). When a trial court allows the State to introduce a defendant's prior convictions to impeach his credibility, the court should immediately give a limiting instruction informing the jury of the limited purpose for which the testimony is being offered. *State v. Goney*, 87 Ohio App.3d 497, 503 (2d Dist. 1993). The trial court did not give a limiting instruction nor did Day's attorney request one directly or ensure the instruction was included in the agreed instructions.

{¶ 73} Nevertheless, we are mindful that "the decision of whether or not to request a particular jury instruction is a matter of trial strategy and . . . will not substantiate a claim of ineffective assistance of counsel." *State v. Thompson*, 2019-Ohio-2525, ¶ 21 (10th Dist.), citing *State v. Glenn-Coulverson*, 2017-Ohio-2671, ¶ 56 (10th Dist.), citing *State v. Morris*, 2005-Ohio-1136, ¶ 100 (9th Dist.). In the instant

case, there was a possibility that the State would seek to impeach Day with his prior convictions when he elected to testify. The defense's trial strategy hinged on Day telling his side of the story. He was the only surviving eyewitness to the entire shooting. Counsel may have thought that a limiting instruction would emphasize Day's prior convictions, focusing the jury's attention on the prior convictions and not on Day's actual testimony. However, even if this was not the case, we find that Day was not prejudiced by any alleged errors of his counsel. Day has failed to establish prejudice, i.e., that the outcome of the trial would have been different but for his counsel's alleged errors. There was overwhelming evidence of guilt in this case, such that the alleged error did not change the outcome of the trial.

{¶ 74} Accordingly, Day failed to establish ineffective assistance as to the failure to request a limiting instruction.

{¶ 75} Next, Day argues that his trial counsel was also ineffective because she did not request or object to an instruction that Day was presumed to act in self-defense when he was in his house. Day is referring to the rebuttable presumption created in R.C. 2901.05(B)(2) which states:

> A person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

{¶ 76} This presumption contemplates a home invasion, "'i.e., the person against whom the defensive force is used is in the process of unlawfully and without

privilege entering (or has entered) the defendant's residence.'" *State v. Cunningham*, 2025-Ohio-347, ¶ 43 (5th Dist.), quoting *State v. Estelle*, 2021-Ohio-2636, ¶ 15 (3d Dist.), citing *State v. Nye*, 2013-Ohio-3783, ¶ 29 (3d Dist.). In the instant case, it is crucial to note that a person's driveway is not a part of the residence. *Id.* at ¶ 42, citing R.C. 2901.05(D)(2) and *State v. Moore*, 2020-Ohio-4321, ¶ 21 (4th Dist.).

{¶ 77} When considering whether the defendant is entitled to this jury instruction, "the trial court must focus on the conduct and location of the victim at the time the defendant claims to be acting in self-defense." *Id.* at ¶ 45, quoting *Estelle* at ¶ 16, *State v. Robinson*, 2023-Ohio-2325, ¶ 30 (11th Dist.).

{¶ 78} The video of the incident showed Day firing his weapon from a partially open door. Rotger is not visible and is later found lying on the ground next to his scooter over 21 feet from the side door. There was no evidence that Rotger was attempting to unlawfully enter Day's home at the time Day shot him. Furthermore, while Day testified that Rotger was approaching him, the physical evidence established that five of the gunshot wounds occurred when Rotger was facing away from the weapon and one of the fatal bullets was fired when Rotger's back was turned and when he was already on the ground. Based on the foregoing, Day's counsel did not err because Day was not entitled to the presumption that his actions were justified because Rotger was not trying to enter nor had he entered Day's home.

{¶ 79} Finally, Day argues his trial lawyer erred when she failed to object to the instruction on unreasonable force when there was no factual question as to whether the force used was deadly or nondeadly.

{¶ 80} One of the tenets associated with the use of force in self-defense is that "'the defendant may only use "that force, which is reasonably necessary to repel the attack."'" *State v. Giglio*, 2023-Ohio-2178, ¶ 24 (8th Dist.), quoting *State v. Rhymer*, 2021-Ohio-2908, ¶ 19 (1st Dist.), quoting *Williford*, 49 Ohio St.3d at 249. *Giglio* involved the use of deadly force where the defendant similarly objected to an instruction on unreasonable force. This court noted that "the trial court's instruction complied with Ohio law regarding the defendant's use of deadly force in self-defense and the requirement that the force used cannot be unreasonable." *Id*. Therefore, the trial court properly instructed the jury on unreasonable force and Day's counsel did not err when she did not challenge the instruction.

{¶ 81} Accordingly, the eighth assignment of error is overruled.

**Limiting Instruction on Prior Convictions**

{¶ 82} In the fifth assignment of error, Day argues that the trial court committed plain error when it failed to instruct the jury on the permitted use of testimony regarding a defendant's prior convictions. The State concedes that it was an error for the trial court to not include such an instruction, but argues that (1) Day invited the error by submitting the agreed jury instructions and that (2) Day failed to establish that the error effected the outcome of the trial or that it created a

manifest injustice that warrants reversal of the convictions. We find merit in the State's argument and reject Day's argument as not well taken.

{¶ 83} Where the defense did not request a limiting instruction or otherwise object to the jury instructions, we limit our review to whether the trial court committed plain error by not sua sponte giving the limiting instruction. *State v. Cunningham*, 2018-Ohio-912, ¶ 14 (12th Dist.), citing *State v. Cox*, 2006-Ohio-6075, ¶ 20 (12th Dist.); Crim.R. 30(A).

{¶ 84} Plain error is not present if "'[n]othing suggests that the jury used "other acts" evidence to convict [the defendant] because [he] was a bad person.'" *State v. Moore*, 2011-Ohio-636, ¶ 24 (2d Dist.), quoting *State v. Perez*, 2009-Ohio-6179, ¶ 136, citing *State v. Diar*, 2008-Ohio-6266, ¶ 91, citing *State v. Grant*, 67 Ohio St.3d 465, 472 (1993).

{¶ 85} We have already discussed that any errors in the jury instructions were invited when the parties submitted agreed instructions and that decisions regarding jury instructions are within the province of the attorney's strategic decision-making. Further, we have found that Day did not receive ineffective assistance of counsel because he failed to establish that the outcome of the trial would have been different but for counsel's alleged errors. Accordingly, the record does not reflect plain error. There is nothing in the record to suggest that the jury relied on other acts evidence to convict Day.

{¶ 86} Accordingly, the fifth assignment of error is overruled.

**Instruction on Reckless Homicide as a Lesser Included Offense**

{¶ 87} In the sixth assignment of error, Day argues that it was prejudicial error for the trial court to refuse to instruct on the lesser included offense of reckless homicide for the crime of purposeful murder under Count 2. We disagree.

{¶ 88} An offense is a lesser included offense of another when "'the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed.'" *State v. Owens*, 2020-Ohio-4616, ¶ 8, quoting *State v. Evans*, 2009-Ohio-2974, ¶ 26. Multiple courts have found that reckless homicide under R.C. 2903.041 is a lesser included offense of murder under R.C. 2903.02(A) because the only difference in the two crimes is the mens rea. *See State v. Thorpe*, 2021-Ohio-1295, ¶ 18 (8th Dist.); *State v. Turner*, 2019-Ohio-144, ¶ 31 (2d Dist.); *State v. Lawson*, 2023-Ohio-3456, ¶ 21 (9th Dist.); *State v. McCurdy*, 2003-Ohio-5518, ¶ 14 (1st Dist.). Murder requires a purposeful act while reckless homicide requires a reckless one. "When recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." R.C. 2901.22(E).

{¶ 89} Day argues that the trial court was required to instruct the jury on reckless homicide because it is a lesser included offense of purposeful murder. This is an incomplete statement of the law. A defendant is not entitled to an instruction on an offense simply because it is a lesser included offense of a charged crime. A trial court is required to charge the jury on the lesser included offense only "[w]here the evidence presented by the defense, if believed, would support both an acquittal

of the greater offense and a conviction on the lesser included offense." *Turner* at ¶ 32, citing *State v. Barker*, 2012-Ohio-522, ¶ 172, citing *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus.

{¶ 90} Here, Day claimed self-defense, which is an admission that he engaged in the conduct charged but that there was a justification. Day testified that he shot Rotger because he feared for his life and the lives of his family. Purposeful action denotes "the person's specific intention to cause a certain result." R.C. 2901.022(A). The act of discharging a firearm in another person's direction establishes that the shooter had the specific intention to kill. *State v. Wilson*, 2011-Ohio-5653, ¶ 6 (8th Dist.). The evidence presented by the defense did not support both an acquittal on the murder charge and a conviction of reckless homicide. Therefore, the trial court did not err when it refused to instruct the jury on reckless homicide.

{¶ 91} Accordingly, the sixth assignment of error is overruled.

**Partial Admission of an Exhibit**

{¶ 92} Finally, in his seventh assignment of error, Day argues it was error for the trial court to refuse to admit the video and audio recording of Day's interview with the police. Day's argument is not well-taken.

{¶ 93} During his case-in-chief, Day played the first seven or eight minutes of the approximately 40-minute recording to the jury. The trial court did not refuse to allow the jury to hear the evidence; the court merely refused to submit the excerpt

of the video to the jury during deliberations. Additionally, the defense did not object to the trial court's decision.

{¶ 94} Day has not raised plain error, nor has he argued how he was prejudiced by the jury hearing the video but not having the video during deliberations. An appellate court may disregard any assignment of error where the party raising it "fails to argue the assignment separately in their brief." *Doe v. Cuyahoga Cty. Community College*, 2022-Ohio-527, ¶ 25 (8th Dist.), quoting App.R. 12(A)(2).

{¶ 95} Day argues that he was prejudiced by the trial court's statement during sentencing that Day's testimony regarding recognizing Rotger's voice may have been recently fabricated for trial. However, in context, the trial court mentioned the statement merely to call attention to Day's lack of reaction to the realization that he shot his friend. If Day's testimony was true, the trial court found it remarkable that Day did not exclaim that he shot Rotger or yell for others in the house to call 9-1-1 while he, the godfather of Rotger's children, took care of his friend. Furthermore, Day fails to explain how the trial court's statement after the verdict established that the jury was prejudiced during its deliberations or how he was prejudiced by the trial court's statement, i.e., how the statement would have changed the outcome of the trial.

{¶ 96} Consequently, the seventh assignment of error is overruled.

{¶ 97} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

LISA B. FORBES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR